UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| LISA HERRERA, ) | |
| ) | |
| Plaintiff, ) | Case No. SACV 09-839 AJW |
| ) | |
| v. ) | MEMORANDUM OF DECISION |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income ("SSI") benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

Plaintiff filed an application for SSI benefits on May 16, 2006, alleging that she had been disabled since June 1, 2001 due to a herniated disc, depression, anxiety, fibromyalgia, restless leg syndrome, pelvic discomfort, and irritable bowel syndrome. [JS 2; Administrative Record ("AR") 91, 102]. In a written hearing decision that constitutes the Commissioner's final decision in this matter, an administrative law judge ("ALJ") concluded that plaintiff was not disabled. [AR 9-20]. The ALJ found that plaintiff had a severe combination of impairments consisting of status post partial bilateral laminectomy, excision of disc

1 herniation, and bilateral foraminotomy at L5-S1; depressive disorder, not otherwise specified ("NOS");
2 cannabis abuse; and alcohol abuse. [AR 12]. The ALJ determined that plaintiff retained the residual
3 functional capacity ("RFC") to perform a restricted range of light work. [See AR 13]. The ALJ concluded
4 that plaintiff was not disabled because her RFC did not preclude her from performing work available in
5 significant numbers in the national economy.[1] [AR 13-20].

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r, Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Social Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)).

## Discussion

**Medical opinion evidence**

Plaintiff contends that the ALJ failed properly to consider the opinion of the Commissioner's

---

[1] Plaintiff filed a prior application for benefits that was denied at the reconsideration level on May 17, 2005 and was not appealed. The ALJ declined to reopen that application. [AR 9]. Therefore, the relevant period is May 18, 2005 through December 23, 2008, the date of the ALJ's decision. See Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1995) (holding that the Commissioner properly applied res judicata to bar reconsideration of a period for which a prior, final determination had been made by declining to reopen the prior application); see also Udd v. Massanari, 245 F.3d 1096, 1098-1099 (9th Cir. 2001) ("A decision not to reopen a prior, final benefits decision is discretionary and ordinarily does not constitute a final decision; therefore, it is not subject to judicial review.") (citing Califano v. Saunders, 430 U.S. 99, 107-109 (1977)).

consultative examining physician, J. Pierce Conaty, M.D., and a treating source psychological assessment. [JS 3-8, 8-13].

In general, "[t]he opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citing Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)); see 20 C.F.R. §§ 404.1502, 404.1527(d)(2), 416.902, 416.927(d)(2). An examining physician's opinion, in turn, generally is afforded more weight than a non-examining physician's opinion. Orn, 495 F.3d at 631; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). If contradicted by the opinion of another doctor, a treating or examining physician's opinion can be rejected only for specific and legitimate reasons that are based on substantial evidence in the record. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan v. Halter, 242 F.3d 1144, 1148-1149 (9th Cir. 2001); Lester, 81 F.3d at 830-831.

**Dr. Conaty**

Dr. Conaty, a board-certified orthopedic surgeon, evaluated plaintiff on April 4, 2008. [AR 265-269]. He elicited a history, reviewed medical records, conducted an orthopedic examination, and reviewed lumbar spine x-rays taken that day. [AR 265-268]. Dr. Conaty diagnosed "[s]tatus postoperative laminectomy and discectomy, lumbosacral, for herniated disc disease, performed five years ago, with current evidence of significant degenerative disc disease, lumbosacral." [AR 268]. In a narrative assessment, Dr. Conaty opined that plaintiff was capable of "[l]ifting and carrying would be 20 pounds occasionally and 10 pounds frequently, standing and walking for up to 6 hours in a 4-hour [sic] workday, and sitting for 6 hours in an 8-hour workday. Climbing, stooping, kneeling, and crouching would be limited to occasionally or one-third of workday activities.". [AR 269].

On the same date he completed his examination report, Dr. Conaty completed a physical activities assessment form. [AR 270-280]. That form posed questions about the claimant's ability to perform some work-related physical activities that Dr. Conaty did not discuss in his examination report. One such question was: "Can the individual walk a block at a reasonable pace on rough or uneven surfaces?" [AR 280]. Dr. Conaty answered "No." [AR 280]. Plaintiff contends that the ALJ erred in rejecting that aspect of Dr. Conaty's opinion and in failing to incorporate that limitation into plaintiff's RFC. [See JS 3-8, 13-15].

The ALJ said that he "generally accepted" Dr. Conaty's opinion. [AR 13]. The ALJ noted, however,

3

1  that certain logical and internal inconsistencies existed within and between Dr. Conaty's examination report
2  and his responses on the form. The ALJ resolved those inconsistencies and explained his rationale. [AR
3  13-14]. See Morgan, 169 F.3d at 601 ("Where medical reports are inconclusive, 'questions of credibility
4  and resolution of conflicts in the testimony are functions solely of the [Commissioner].'") (quoting Sample
5  v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982)).

6      For example, the ALJ observed that Dr. Conaty identified postural and environmental limitations
7  on the form that he did not mention in the narrative assessment portion of his examination report. [AR 13;
8  see AR 276, 278]. The ALJ surmised that Dr. Conaty "simply overlooked these limitations in his narrative."
9  [AR 13]. Viewing the evidence "in a light favorable to" plaintiff, the ALJ adopted those postural and
10 environmental limitations, except for a limitation to occasional exposure to respiratory irritants. [AR 13-14].
11 The ALJ reasoned that there was little record evidence that plaintiff had any significant respiratory ailments
12 or conditions, and that there appeared to be no rational relationship between plaintiff's musculoskeletal
13 impairments and a need to avoid exposure to respiratory irritants. [AR 14]. Plaintiff does not challenge that
14 finding, which in any event is supported by substantial evidence and free of legal error.

15     Plaintiff, however, does challenge the ALJ's silent disregard of Dr. Conaty's conclusion that plaintiff
16 could not walk a block at a reasonable pace on rough or uneven surfaces. Dr. Conaty did not include that
17 limitation in his narrative report. However, he checked it off in a section of the form assessment asking
18 whether or not the claimant could go shopping, travel without a companion, ambulate without an assistive
19 device, use standard public transportation, climb a few stairs at a reasonable pace with the use of a single
20 hand rail, prepare a simple meal, feed himself or herself, care for personal hygiene, and "sort, handle, use
21 paper/files." [AR 280]. Those questions concern the ability to perform activities of daily living. Cf. SSR
22 91-8p, 1991 WL 333939, at *4 ("[A]ctivities of daily living include, but are not limited to, such activities
23 as doing household chores, grooming and hygiene, using a post office, taking public transportation, and
24 paying bills.").

25     The ALJ did not rate plaintiff's ability to perform activities of daily living in his RFC assessment,
26 and his failure to do so was not legal error. The RFC assessment must address the claimant's exertional
27 capacity, which concerns "an individual's limitations and restrictions of physical strength and defines the
28 seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." SSR 96-8p,

1996 WL 374184, at *5. The ALJ addressed plaintiff's exertional capacity in his RFC finding. Specifically, the ALJ found that plaintiff "can lift and carry 20 pounds occasionally, 10 pounds frequently, standing and walking 4 hours each in an 8-hour workday, sitting without significant limitations." [AR 13]. No pushing or pulling limitations were noted.

> The RFC assessment also must address all work-related limitations and restrictions that do not depend on an individual's physical strength; i.e., all physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions. It assesses an individual's abilities to perform physical activities such as postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision). In addition to these activities, it also considers the ability to tolerate various environmental factors (e.g., tolerance of temperature extremes).

SSR 96-8p, 1996 WL 374184, at *6.

The ALJ addressed plaintiff's non-exertional limitations in his RFC finding. [AR 13]. Specifically, the ALJ found that plaintiff "may engage in postural activities occasionally, except that she is precluded from climbing ropes, ladders and scaffolds. Finally, [plaintiff] is limited to occasional environmental exposure with the exception of noise and respiratory irritants. Mentally, [plaintiff] is limited to simple repetitive tasks but has no other significant limitations." [AR 13].

An "RFC is what an individual can still do despite his or her limitations," and is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work- related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2. Evidence regarding a claimant's ability to perform activities of daily living, such as the testimony of the claimant or third parties, ordinarily is considered in formulating an RFC. See SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."). However, the RFC finding does not specifically include a rating of the

claimant's ability to perform particular daily activities. Furthermore, the ALJ is not required to consider every conceivable non-exertional impairment or combination thereof. The Commissioner's regulations direct the ALJ to consider certain mental, postural, manipulative, visual, communicative, and environmental limitations that are relevant to the ability to work. See SSR 96-8p, 1996 WL 374184, at *6. The ALJ considered the appropriate exertional and non-exertional limitations. He defined plaintiff's RFC with the required level of specificity, and he gave appropriate deference to Dr. Conaty's findings regarding plaintiff's exertional and non-exertional limitations, which included the ability to stand or walk four hours each in an eight-hour workday. Thus, the ALJ did not err in failing specifically to address, or give reasons for rejecting, Dr. Conaty's finding that plaintiff could perform several routine daily activities but could not "walk a block at a reasonable pace on rough or uneven surfaces." [AR 280].

Furthermore, nothing in the record suggests that such a limitation, if accepted, would erode the occupational base for the full range of sedentary work reflected in Rule 201.21 of the Medical-Vocational Guidelines, which the ALJ relied upon to find plaintiff "not disabled." [AR 19-20]. See 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"). Sedentary work by its very nature is performed mostly in a seated position, with occasional walking or standing. See 20 C.F.R. §§ 404.1567(a), 416.967(a). The Dictionary of Occupational Titles ("DOT") is one of the primary sources of job data relied on by the Commissioner in establishing the physical and mental demands of jobs as ordinarily performed in the national economy and in promulgating the grid rules. See 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b). The job definitions in the DOT do not include any rating of an individual's ability to walk on uneven surfaces at a reasonable pace. See DOT, Parts of the Occupational Definition; Appendix B: Explanation of Data, People, and Things; Appendix C: Components of the Definition Trailer (4th ed. rev.1991).

For all of these reasons, plaintiff's contention that the ALJ improperly evaluated Dr. Conaty's opinion lacks merit.

**Treating source mental assessment**

Plaintiff also contends that the ALJ failed properly to consider certain findings reflected on an "Adult Initial Assessment" dated August 31, 2006. [JS 8-13; see AR 351-356]. That assessment was prepared by a Los Angeles County Department of Mental Health ("County mental health") marriage and

family therapist, Elaine J. Allen. [See AR 356]. It was cosigned by a clinician whose name is illegible, and who does not appear to have identified himself or herself as either an "M.D." or a "Ph.D."[2] [See AR 356].

Among other things, Ms. Allen reported that plaintiff's motor activity was restless, her mood was dysphoric and tearful, her thought process associations were loose, and her concentration was impaired. [AR 355]. In addition, Ms. Allen gave plaintiff a Global Assessment of Function ("GAF") score of 42, denoting serious symptoms, such as suicidal ideation, severe obsessional rituals, frequent shoplifting, or any serious impairment in social, occupational, or school functioning, such as a lack of friends or inability to keep a job. See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") Multiaxial Assessment, 27-36 (rev. 2000)). [AR 174]. Plaintiff was admitted for psychiatric hospitalization on a 72 hour hold. [See AR 349].

Plaintiff argues that "logic and common sense alone tell us that an individual . . . whose motor activity is restless, mood is dysphoric and tearful, thought process associations are loose, and concentration is impaired will have difficulties satisfactorily engaging in full time employment, yet the ALJ ignored this relevant treating source opinion without explanation, which is impermissible." [JS 8].

Plaintiff's appeal to "logic and common sense" sidesteps the controlling question, which is whether the ALJ complied Ninth Circuit's "Social Security precedents[, which] have developed a highly articulated set of standards for reviewing an ALJ's decision to reject different types of testimony." Valentine v. Comm'r Social Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009). Under Ninth Circuit law, the ALJ's failure to give reasons for rejecting Ms. Allen's findings is not reversible error because a marriage and family therapist is not an "acceptable medical source" within the meaning of the regulations. See 20 C.F.R. §§ 404.1513(a), 416.913(a). "Other sources," that is, sources other than "acceptable medical sources," also may provide information that is relevant to assess impairment severity and its affect on the ability to work. However, the ALJ is permitted to give less weight to information from other sources. See 20 C.F.R. §§ 404.1513(d), 416.913(d) (stating that information from "other sources" may be considered); see Gomez v.

---

[2] Plaintiff does not contend that the form was cosigned by a licensed physician, licensed psychologist, or other "acceptable medical source" as defined by the regulations. See 20 C.F.R. §§ 404.1513(a), 416.913(a).

Chater, 74 F.3d 967, 970-971 (9th Cir.) (holding that the regulations permit the Commissioner to give "less weight" to opinions from "other sources"), cert. denied, 519 U.S. 881 (1996).

The ALJ mentioned plaintiff's County mental health treatment reports in his decision. [See AR 16]. Specifically, he noted that plaintiff was "briefly hospitalized for suicidal ideation in September 2006. At that time, she was diagnosed with major depression and opioid dependence. However, there is no record of [plaintiff's] receiving any sustained treatment, or care, by psychiatrists or other mental health specialists." [AR 16 (citing AR 348-356)]. The ALJ noted that a consultative psychiatrist who examined plaintiff at the Commissioner's request in August 2006 found that her mental status was entirely normal. [AR 16 (citing AR 225)]. The consultative examining physician, Dr. Yang, diagnosed depressive disorder NOS and gave plaintiff a GAF score of 64, denoting only mild symptoms or a mild level of functional impairment. DSM-IV Multiaxial Assessment, 27-36 (rev. 2000). Dr. Yang assessed no work-related functional limitations. The nonexamining state agency physician agreed with that assessment. [AR 239-250].

The ALJ further noted that a second consultative examiner, Dr. McGee, conducted a psychological examination in April 2008 that included a battery of tests. [AR 16, 251-263]. Plaintiff's performance on the Wechsler Adult Intelligence Scale-III yielded a full-scale IQ in the low average range. [AR 255]. Her test results on the Rey 15-Item Memory Test, Raven Progressive Matrices, Trail-Making Test, Parts A and B, and Wechsler Memory Scale-III were within normal limits. [AR 16, 255-256]. Her performance on the Minnesota Multiphasic Personality Inventory II yielded a profile of a person with a long-standing neurotic conflict who is passive, dependent, immature, and presents with multiple physical and mental complaints. [AR 16, 256-257]. Like Dr. Yang, Dr. McGee diagnosed depressive disorder NOS. [AR 257]. Dr. McGee also diagnosed cannabis and alcohol abuse. [AR 257]. Dr. McGee concluded that plaintiff could perform routine, repetitive work. [AR 257-258].

The ALJ credited the diagnosis of depression NOS made by Drs. Yang and McGee, and he endorsed Dr. McGee's functional assessment by finding that plaintiff was limited to simple, repetitive tasks. [AR 16]. The ALJ observed that although plaintiff was briefly hospitalized for her psychiatric symptoms in September 2006 (after being assessed by Ms. Allen), "there is no evidence that this level of acute symptoms persisted for any extended period of time, let alone 12 months or more, as required." [AR 16 (citing AR 348-356)].

1  Substantial evidence in the record as a whole supports the ALJ's finding regarding plaintiff's mental
2  impairment, and he did not err in evaluating Ms. Allen's findings.

**RFC finding**

Plaintiff contends that the ALJ's RFC finding is defective because it omits the limitations found in the reports of Dr. Conaty and Ms. McGee that are described above. Plaintiff also argues that the ALJ acknowledged that plaintiff had a "lengthy and extensive history of back pain," but "ignored" plaintiff's back pain in his RFC finding. [JS 13-15].

For the reasons set forth above, the ALJ properly considered the reports of Dr. Conaty and Ms. Allen, and he did not err in rejecting the limitations identified by plaintiff. Therefore, the ALJ's RFC finding is not defective because it excludes those limitations.

The ALJ acknowledged plaintiff's "lengthy and extensive history of back pain" in the context of a review of plaintiff's medical records from 2001, long before the beginning of the relevant period on May 18, 2005. [AR 15]. See note 1, supra. The ALJ noted evidence of a disc protrusion and mild degenerative changes in September 2001. [AR 15]. Plaintiff underwent surgical treatment for her back impairment (a partial bilateral laminectomy, herniation excision, and bilateral foraminotomy) in July 2003. [AR 15]. The ALJ found that plaintiff's back condition amounted to a severe impairment that limited her ability to work. However, the ALJ said that there was "little clinical evidence of [nerve root or spinal cord] impingement or other neurological involvement in the treatment records at this time." [AR 15 (citing AR 164-176)]. He also permissibly relied on the opinion of Dr. Conaty, an orthopedist, who evaluated plaintiff's signs and symptoms and opined that she retained the ability to work during the relevant period.

Significantly, plaintiff does not challenge the ALJ's credibility evaluation in any other respect. Where, as here, a disability claimant produces evidence of an underlying physical or mental impairment that is reasonably likely to be the source of his or her subjective symptoms, the adjudicator is required to consider all subjective testimony as to the severity of the symptoms. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991) (en banc); see also 20 C.F.R. §§ 404.1529(a), 416.929(a) (explaining how pain and other symptoms are evaluated). Although the ALJ may then disregard the subjective testimony he considers not credible, he must provide specific, convincing reasons for doing so. Tonapetyan, 242 F.3d at 1148; see also Moisa, 367 F.3d at 885 (stating that in the

absence of evidence of malingering, an ALJ may not dismiss the subjective testimony of claimant without providing "clear and convincing reasons"). The ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa, 367 F.3d at 885; see Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) (enumerating factors that bear on the credibility of subjective complaints); Fair v. Bowen, 885 F.2d 597, 604 n.5 (9th Cir. 1989)(same). If the ALJ's assessment of the claimant's testimony is reasonable and is supported by substantial evidence, it is not the court's role to "second-guess" it. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

In evaluating the credibility of plaintiff's subjective symptoms, the ALJ noted that there was considerable evidence in the record of drug-seeking behavior, narcotics abuse, and substance abuse that undermined the credibility of her subjective pain complaints. [AR 15, 17]. In addition, the "[o]bjective medical evidence supporting the presence of profound pain is mixed, at best." [AR 15]. For example, there were no imaging studies or electrodiagnostic test results indicating that plaintiff had radiculopathy or loss of nerve function. [AR 15-16]. The ALJ also pointed to plaintiff's paltry work history and inconsistent statements she made about her work history and back disorder. [See AR 15, 17-18]. The ALJ carefully analyzed of the credibility of plaintiff's subjective complaints, and he rationally inferred that the record "raises serious concerns that [plaintiff] is claiming profound pain to obtain narcotics, not vice versa." [AR 17-18].

Plaintiff's focus on the ALJ's observation that plaintiff had a "lengthy and extensive history" of back pain completely ignores the context in which that statement was made, as well as the other evidence that the ALJ relied upon in assessing her subjective symptoms. Her contention that the ALJ ignored her history of back pain is meritless.

**Vocational expert testimony**

Plaintiff contends that the ALJ erred in finding her disabled at step five without obtaining testimony from a vocational expert. [JS 15-18].

At step five, the Commissioner has the burden to establish that there are a significant number of jobs in the national economy that the claimant can perform. The Commissioner may meet the burden by taking the testimony of a vocational expert, or by consulting the grids. Tackett v. Apfel, 180 F.3d 1094, 1100-1101

(9th Cir. 1999). The grids may be used when the claimant's non-exertional limitations do not significantly affect his exertional capabilities. On the other hand, when a claimant's non-exertional limitations significantly limit the range of work permitted by the claimant's exertional limitations, then use of the grids to find him not disabled is inappropriate. Tackett, 180 F.3d at 1101-1102. When the grids do not accurately describe the claimant's functional capacity, the ALJ must take the testimony of a vocational expert. Tackett, 180 F.3d at 1103-1104. Based on that testimony, the ALJ must identify specific jobs within the claimant's capabilities. Thus, the grids will be inappropriate where the predicate for their use—the ability to perform a full range of either medium, light or sedentary activities—is not present. Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988).

The ALJ found that plaintiff had a combination of exertional and non-exertional limitations that restricted her to a range of light work. More specifically, the ALJ found that plaintiff retained the exertional capacity for light or sedentary work, but that she also had postural, environmental, and mental non-exertional limitations. [AR 19-20].

Citing SSR 96-9p, the ALJ found that plaintiff's postural and environmental limitations did not significantly limit her ability to perform sedentary work, and therefore that those limitations did not preclude reliance on the grids. In promulgating the grids, the Commissioner has "take[n] administrative notice of the existence of numerous unskilled occupations within each of th[e] exertional levels." SSR 96-9p, 1996 WL 374185, at *2. The grid rules that incorporate a limitation to sedentary work "take administrative notice that there are approximately 200 separate unskilled sedentary occupations, each representing numerous jobs, in the national economy." SSR 96-9p, 1996 WL 374185, at *3. The "inability to perform substantially all sedentary unskilled occupations," however, "does not equate with a finding of disability. There may be a number of occupations [among] the approximately 200 occupations administratively noticed, and jobs that exist in significant numbers, that an individual may still be able to perform even with a sedentary occupational base that has been eroded." SSR 96-9p, 1996 WL 374185, at *4.

In SSR 96-9p, the Commissioner states that postural limitations related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling do not usually significantly erode the occupational base for a full range of unskilled sedentary work, and that most environmental restrictions do not result in a significant erosion of the unskilled sedentary occupational base. See SSR 96-9p, 1996 WL

374185, at *7-*9. Two environmental restrictions that may erode that occupational base, and therefore need an individualized determination, are a need to avoid exposure to noise and to odors or dust. See SSR 96-9p, 1996 WL 374185, at *8. However, there was no evidence that plaintiff needed to avoid noise in the workplace, and the ALJ permissibly concluded that she did not have any restriction against exposure to odors, dust, or other respiratory irritants. Therefore, the ALJ did not err in finding that plaintiff's non-exertional postural and environmental limitations did not erode the sedentary unskilled occupational base reflected in the grid rule he applied.

The ALJ also found that plaintiff had a mental non-exertional limitation to simple, repetitive tasks. [AR 13]. Plaintiff asserts, without citation to supporting authority, that such a limitation "significantly erodes the sedentary base." [JS 16]. Unskilled sedentary work requires the capacity to perform basic work-related mental activities on a sustained basis. SSR 96-9p, 1996 WL 374185, at *9. Mental activities "generally required by competitive, remunerative unskilled work" are:

> Understanding, remembering, and carrying out *simple instructions.*
>
> Making judgments that are commensurate with the functions of unskilled work--i.e., *simple* work- related decisions.
>
> Responding appropriately to supervision, co- workers and usual work situations.
>
> Dealing with changes in a routine work setting.

SSR 96-9p, 1996 WL 374185, at *9 (italics added); see also SSR 85-15, 1985 WL 56857, at *4 (same). A "substantial loss of ability to meet any one of several basic work-related activities on a sustained basis" will substantially erode the sedentary occupational base and would justify a finding of disability, while a "less than substantial loss" may or may not result in significant erosion of the sedentary occupational base. SSR 96-9p,1996 WL 374185, at *9; SSR 85-15, 1985 WL 56857, at *4.

The ALJ found that plaintiff can perform simple, repetitive work. Simple, repetitive work is consistent with two of the four basic work-related activities involved in "competitive, remunerative unskilled work," namely, the ability to understand, remember, and carry out simple instructions and make simple work-related decisions. SSR 96-9p, 1996 WL 374185, at *9; SSR 85-15, 1985 WL 56857, at *4; see also 20 C.F.R. § 404.1568(a) ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.... [A] person can usually learn to do the job in 30

days, and little specific vocational preparation and judgment are needed."); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(l) (stating that "the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people)"). Plaintiff did not have limitations in the ability to respond appropriately to supervision, co-workers and usual work situations or to deal with changes in a routine work setting. Therefore, she retained the ability to perform the basic work-related mental activities required for unskilled work.

The ALJ did not err in concluding that plaintiff's non-exertional limitations did not significantly erode the unskilled sedentary occupational base. The ALJ permissibly relied on the grids to conclude that plaintiff could perform at least a full range of sedentary work and was not disabled. [AR 19-20].

## Conclusion

For the reasons stated above, the Commissioner's decision is supported by substantial evidence and is free of legal error. Accordingly, the Commissioner's decision is **affirmed.**

**IT IS SO ORDERED.**

November 15, 2010

_____
ANDREW J. WISTRICH
United States Magistrate Judge